**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JULLEE CHAMBERLAIN,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL ACTION NO. 3:16-1408** |
| | : | |
| **v.** | : | |
| | : | **(JUDGE MANNION)** |
| **WYOMING COUNTY,** | : | |
| | : | |
| **Defendant** | : | |

## M E M O R A N D U M

Plaintiff Jullee Chamberlain filed this action asserting claims against defendant Wyoming County under the Americans with Disabilities Act, the Rehabilitation Act of 1973, the Family Medical Leave Act as well as the Age Discrimination in Employment Act. Plaintiff essentially alleges that Wyoming County discriminated and retaliated against her and eventually fired her because of her disabilities, her FMLA protected leave, and her age. The County contends that plaintiff was terminated due to her hostile behavior in the work place and her continuous harassment of her co-workers. Defendant County filed a motion for summary judgment pursuant to Fed.R.Civ.P. 56 with respect to all nine claims raised by plaintiff. (Doc. 28). For the following reasons, the County's motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    MATERIAL FACTS[1]

Plaintiff was employed with the County for over 14 years, including positions as Administrative Assistant and Bookeeper for the Wyoming County Conservation District.

During the time she worked for the County, plaintiff was a member of the AFSCME Union and she was the Union Shop Steward for 8 years until her termination. Plaintiff was trained in grievance procedures in her position as Union Shop Steward.

### JUNE 20, 2014 COMPLAINT LETTER

On June 20, 2014, the employees in the County Conservation District Office requested a meeting with the three County Commissioners and the County's Chief Clerk, William Gaylord, regarding a hostile environment in their office. The Commissioners and Gaylord then met with the employees in the Conservation District Office and, they were presented with materials. Plaintiff was not present during the June 20 meeting since she had left work early that day. The Commissioners then asked the employees to prepare a formal written complaint. (Doc. 36-2 at 9-10). Later that day the Commissioners received the formal complaint.

Specifically, the Commissioners received a letter dated June 20, 2014,

---

[1]The material facts are derived from the County's statement of facts, (Doc. 29), the plaintiff's response, (Doc. 36), and the exhibits filed by both parties. The court only includes facts material to the issues in the case, and it does not include legal conclusions.

signed by four of plaintiff's co-workers and the District Manager in the Conservation District Office, Doug Deutsch. (Doc. 30-1 at 107). In the letter, the employees complained to the County Commissioners about plaintiff's abusive behavior in the office and stated that over a course of many years they felt "intimidated and harassed by Jullee's hostile behavior." They stated that they could no longer tolerate the conditions and, that the long standing abuse created by the plaintiff caused them embarrassment, emotional distress and discontent. While plaintiff claims that either a County Commissioner, Thomas Henry, or Gaylord, requested plaintiff's co-workers to prepare the complaint letter, Gaylord and Henry testified that they did not do so. Plaintiff alleges that Henry's deposition testimony and his testimony in her union arbitration proceeding, (Doc. 36-2 at 9-10), was inapposite. However, as stated, Henry testified at plaintiff's union arbitration proceeding that after hearing the complaints from plaintiff's co-workers, the Commissioner's requested the co-workers to prepare a formal written complaint.

The Commissioners again met on June 23, 2014. Gaylord and plaintiff were also present for this meeting. Tammy Goodwin, another County employee, was also at the meeting as plaintiff's union representative. During the meeting, the Commissioners discussed the content of the complaint letter with plaintiff and plaintiff was allowed to respond to the allegations in it. After the meeting, Henry suggested that the plaintiff go home for the day since she was upset, but this did not constitute a suspension and she was paid for this

3

day. Henry testified that plaintiff was on paid administrative leave. Plaintiff returned to work on June 24, 2014.

Plaintiff then filed a grievance regarding the June 20, 2014 letter from her co-workers. Plaintiff claimed that she was the real victim in the office and that she was subjected to harassment. She also claimed that Deutsch witnessed the harassment and participated in it. However, plaintiff did not file any grievance against Deutsch or her co-workers regarding their alleged harassment of her. Plaintiff stated that she was not allowed to file a grievance against co-workers who were union members. Plaintiff did informally complain about Deutsch to Commissioner Judy Kraft Mead sometime around 2012-2013. Other than these two discussions with Mead, plaintiff never spoke to any of the other Commissioners about the alleged harassment in her office.

While Deutsch did not have authority to fire plaintiff, he did have authority to discipline her. However, before the complaint letter, Deutsch had not disciplined plaintiff about her behavior in the office. In fact, plaintiff stated that she was not disciplined in all of her years working for the County. Nor did plaintiff ever receive any verbal or written warning about her conduct in the office. Deutsch indicated that he did, however, keep confidential memos containing disciplinary notes regarding plaintiff's poor behavior over the last six years. He saved the memos on his computer but he did not share the memos with plaintiff or anyone else in the County. He kept the files for his personal reference and kept similar files for each employee he supervised.

On July 2, 2014, plaintiff prepared a written response to the complaint

letter advising the Commissioners that she got along with her co-workers and that their allegations were "unfounded." Plaintiff also suggested one reason her co-workers signed the letter was to allow Katie McClain, a younger person, take her job after she was fired. Although plaintiff did not mention her alleged harassment in the office, she did mention other issues she was having and her suspicious that Deutsch "was trying to get all of the staff members to 'unite' and try to remove [her] from [her] position at the District." The Commissioners considered plaintiff's response, conducted meetings, and investigated plaintiff's contentions. As stated, the Commissioners met with both the plaintiff and her co-workers. The Commissioners then concluded that the plaintiff was responsible for creating hostile work conditions in her office.

On Thursday July 3, 2014, plaintiff was called into another meeting with the County Commissioners and Gaylord. At the conclusion of the meeting, Henry suggested that the plaintiff take off the rest of the day, but plaintiff was not suspended. However, Gaylord told plaintiff that he did not want to pay anybody who was not working. Plaintiff replied that she did not have any problems going back to work, so she returned to the office. The Commissioners then scheduled another meeting for July 8, 2014 with the plaintiff and all of the employees in her office.

On Monday July 7, 2014, Henry told the plaintiff to take off that day.

On July 8, 2014, the Commissioners met with all of the employees in Conservation District Office. After all of the employees left the meeting, the Commissioners met several times by themselves and decided that plaintiff's

co-workers were telling the truth about plaintiff's hostile conduct in the office. The Commissioners then voted unanimously to fire the plaintiff. Following the Commissioner's meeting, the plaintiff was advised that her employment with the County was terminated. In their termination letter dated July 8, 2014, the Commissioners stated that plaintiff's "[t]ermination is based on complaints by Conservation District Employees and Department manager and the creation of a hostile work environment." (Doc. 36-16).

### FMLA CLAIMS

Plaintiff was hospitalized from May 27 through May 30, 2014 and the County was aware of it. The parties do not dispute that this hospitalization was FMLA protected. The County listed plaintiff's leave for these days as "sick leave" in its Stop Loss Claim Form. However, there is no indication in the record that plaintiff submitted a written request for FMLA leave regarding her May 27 through May 30, 2014 hospitalization.

Plaintiff was again hospitalized on June 26 and 27, 2014. Plaintiff states that the County and Deutsch were aware of this hospitalization and that it was FMLA protected. Plaintiff missed two days of work during her June 2014 hospitalization but it was not listed as sick leave. Plaintiff did not apply for FMLA leave regarding her June 26 and 27 2014 hospitalization.

Plaintiff had previously requested FMLA during her employment with the County starting in September of 2002, and each time she submitted a written request for such leave. (Doc. 30-1 at 191-194). In fact, prior to her leave for

6

the end of June 2014, plaintiff always requested FMLA leave with the County in writing indicating that it was an FMLA request. At all times relevant to this case, Wyoming County Commissioners would personally approve or deny all requested FMLA leave on behalf of the County. Plaintiff testified that she was not denied any FMLA leave by the County which she requested in writing. However, plaintiff states that the County did not permit employees to apply for FMLA leave, and only provided its employees with FMLA paperwork, after the employees used all of their vacation, personal and sick time. She also points out that the County did not provide FMLA information unless the employee specifically stated that they needed "FMLA leave."

### ADA ACCOMMODATION

Plaintiff testified that she requested an accommodation from Deutsch, supported by a doctor's note, stating that she could not lift over 15 pounds. She supplied a copy of the note to Deutsch, her supervisor, and he told plaintiff not to lift anything over 15 pounds. However, plaintiff stated that when situations at work arose which required lifting of things over 15 pounds, Deutsch would tell plaintiff to lift the objects. Plaintiff did not file a grievance against Deutsch over this issue. Nor did plaintiff speak to the Commissioners about this issue and, she never requested an accommodation for lifting directly from the Commissioners.

Plaintiff also testified that she requested accommodations regarding access to a bathroom because of her medication for her congestive heart

failure and, that she requested necessary breaks from typing due to her arthritis. Specifically, plaintiff testified that in 2011 the County was having construction done in the bathrooms and she requested Deutsch to see about getting temporary portable toilets for her to use. Plaintiff stated that Deutsch refused her request. Plaintiff did not request an accommodation for the temporary portable bathroom directly from the Commissioners.

Although, Deutsch was aware that plaintiff suffered from heart related conditions, he testified that plaintiff never asked him for any accommodation due to her medical conditions. Gaylord testified that, if necessary, plaintiff's supervisors should have been able to handle her requests for accommodations.

### PLAINTIFF'S TESTIMONY

After plaintiff was terminated, she filed a grievance alleging that her rights under the CBA were violated. An Arbitration hearing was held on August 17, 2015. During the hearing, plaintiff testified that she did not treat her co-workers with animosity or hostility. She also testified about three specific occasions in which she felt she was mistreated by her co-workers as examples in support of her claim that she was the victim of harassment in the office, not her co-workers. Plaintiff further testified that during the meetings with the Commissioners prior to her termination, she told them that she was the one who was picked on in the office. Regarding her three specific examples of mistreatment, plaintiff discussed an incident where she was

8

allegedly shoved by a co-worker, an incident where she had a shouting match with a co-worker, and an incident involving a phone in which a co-worker yelled at her after she joked about the co-worker not using it.

In her deposition taken in the present case, plaintiff testified about other incidents when she felt abused or mistreated in her office, including being teased about her medications. Additionally, plaintiff testified that Commissioner Williams was "very hostile", "demeaning" and "rude" toward her, and that if someone asked her a question during meetings, Williams would say "Don't ask her. She doesn't know. Ask Doug." She testified that when she tried to speak with Williams he continued to walk as though she was not talking to him and that he would not acknowledge that she was talking to him. Additionally, plaintiff testified that Williams requested that McClain come into meetings to do her job for her.

Plaintiff also testified that she was continually harassed in her office by Deutsch and her co-workers regarding her age, calling her "old lady", and about her heart condition, saying that her artificial valve "tick[s]' and sounds like a bomb, and that the noise was annoying." She stated that her co-workers made comments about her being in the bathroom all the time. Plaintiff further stated that her co-workers knew she took Coumadin due to her heart condition and that they would call her a "bleeder" and joked about cutting her to "test the theory" if she would bleed. Additionally, plaintiff stated that when she had to wear a halter monitor for her heart, her co-workers would tease her about being near the microwave when it was on.

Although plaintiff testified that she did not report any of the alleged incidents of mistreatment and hostile work environment in her office to the County Commissioners, she had complained to Mead about Deutsch. She also stated that Deutsch was aware of her mistreatment in the office and participated in it. However, plaintiff stated that she never filed a grievance against Deutsch nor her co-workers regarding the alleged harassment in the office.

After she was terminated, plaintiff alleges that she was replaced by McClain who was younger than her. Plaintiff states that McClain is approximately 24 years younger than her. However, the County provided evidence that plaintiff was not replaced by McClain.

After her termination, plaintiff increased her hours working full-time for EIHAB Human Services where she had been working part-time while she was employed at Wyoming County. However, plaintiff alleges that her hourly wage at EIHAB was less than her pay at the County and she did not receive comparable benefits. Plaintiff stopped working at EIHAB in April of 2015, and she has not sought work since then. Plaintiff states that she left EIHAB because she was not physically able to perform the job and they could not accommodate her disabilities.

## II.     PROCEDURAL BACKGROUND

The plaintiff brought this suit on July 7, 2016, asserting federal claims under Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. §794,

under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12131, *et seq*., under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §2601, *et seq* as well as the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq*. (Doc. 1). On November 22, 2016, plaintiff filed an amended complaint. (Doc. 15). Plaintiff asserts nine claims against Wyoming County as a result of her employment termination, namely: Count 1, Disparate Treatment in violation of the RA; Count 2, Failure to Accommodate in violation of the RA; Count 3, Retaliation in violation of the RA; Count 4, Interference in violation of the FMLA; Count 5, Retaliation in violation of the FMLA; Count 6, Disparate Treatment in violation of the ADA; Count 7, Failure to Accommodate in violation of the ADA; Count 8, Retaliation in violation of the ADA; and, Count 9, Age Discrimination in violation of the ADEA.

Following discovery, the County filed a motion for summary judgment on January 12, 2018, pursuant to Fed.R.Civ.P. 56, regarding all of plaintiff's claims in her amended complaint. (Doc. 28). The County simultaneously filed its statement of material facts. (Doc. 29). On January 26, 2018, the County filed its brief in support with exhibits. (Doc. 30). After being granted an extension, plaintiff filed her response to the County's statement of material facts with exhibits on March 16, 2018 and her corrected brief in opposition on March 20, 2018. (Docs. 36 & 37). The County filed a reply brief on April 4, 2018, with exhibits. (Doc. 38).

This court's jurisdiction over the plaintiffs' federal claims is based on 28 U.S.C. §1331.

**III.    DISCUSSION**[2]

**A. <u>Claims Under Section 504 of the Rehabilitation Act</u>**

In Counts 1-3 of her complaint, plaintiff raises claims under §504 of the RA, namely a disparate treatment claim, a failure to accommodate claim, and a retaliation claim. The County initially moves for summary judgment with respect to plaintiff's RA claims arguing that there is insufficient evidence to show that it is a federal agency, contractor or recipient of federal financial assistance. The County argues that plaintiff has not alleged nor provided any evidence that the County is a federal employer or an employer who receives federal funding, and that her claims under the RA must be dismissed.

To bring a claim under the RA, "a plaintiff must show that the allegedly discriminating entity receives federal funding." CG v. PA Dept. of Educ., 734 F.3d at 235 n. 10 (citing Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 n. 20 (3d Cir. 2009)). Thus, the RA prohibits discrimination on the basis of disability in federally funded programs. Blunt v. Lower Merion School Dist., 767 F.3d 247, 274-75 (3d Cir. 2014). The RA "bars both federal agencies and private entities that receive federal funding from discriminating on the basis of disability and is not limited to the employment context." Freed v. Consol. Rail Corp., 201 F.3d 188, 191 (3d Cir.

---

[2]Since the proper standard regarding a summary judgment motion under Fed. R. Civ. P. 56(c) are stated in the briefs of the parties, the court does not repeat it herein. *See also* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).

2000).

In her RA claims contained in her amended complaint, plaintiff does not allege that the County is a recipient of federal funds for the purposes of Section 504. However, plaintiff states in her counter statement of facts that the County receives federal funding citing to the County's Human Services Plans for 2013 through 2017, as well as to her own Declaration in which she avers that it does. (Doc. 36, Ex. R). Specifically, plaintiff states that she has personal knowledge of the County's receipt of federal funding since its Conservation District, where she worked, received federal funding from federal agencies, such as from the United States Fish and Wildlife Commission, the Natural Resource Conservation Service and the United States Department of Agriculture, Rural Development. She also states that she personally handled the checks, took them to Gaylord to be signed, and deposited them into the County's account. She further states that "the County entered into Human Services Plan Assurance of Compliance agreements with the Department of Public Welfare each year from 2013 to 2017, agreeing that:

> as a condition precedent to the receipt of state and federal funds, assures that in compliance with . . . Section 504 of the Federal Rehabilitation Act of 1973 . . . [t]he County does not and will not discriminate against any person because of . . . age . . . or handicap in providing services or employment."

The County's Plans also specifically stated:

> The County hereby expressly, and as a condition precedent to the receipt of state and federal funds, assures that in compliance with Title VI of the Civil Rights Act of 1964: Section 504 of the Federal Rehabilitation Act of 1973; the Age Discrimination Act of 1975; and the Pennsylvania Human Relations Act of 1955, as

amended[.]

The court finds that plaintiff has sufficiently shown that the County received federal funding during the relevant times with respect to her RA claims, Counts 1-3. Thus, insofar as County moved to dismiss plaintiff's RA claims based on her failure to show that the County received federal funding, the County's motion will be denied.

**B. <u>Merits of RA claims, Counts 1-3, and ADA Claims, Counts 6-8</u>**

Plaintiff asserts six disability discrimination claims against the County pursuant to the RA and the ADA. Specifically, in Counts 1 and 6, she alleges disparate treatment in violation of the RA and the ADA. In Counts 2 and 7, she alleges failure to accommodate in violation of the RA and the ADA. In Counts 3 and 8, she alleges retaliation in violation of the RA and the ADA.

Plaintiff's RA and ADA claims are based on the alleged different treatment of her by the County due to her disabilities, on the alleged failure of the County to accommodate her disabilities, and on the alleged harassment she suffered by the County's employees regarding her disabilities. Plaintiff also claims that the County retaliated against her for informing it of her disabilities and requesting it to accommodate her disabilities. In all six counts, plaintiff alleges that the County's adverse actions in harassing her, disciplining her and terminating her were caused by her disabilities.

The County argues that there are no issues of material fact to show that it treated plaintiff disparately, failed to accommodate her or retaliated against

14

her due to her disabilities. The County contends that the complaints about plaintiff in her co-worker's letter was the sole reason for her termination.

Section 504 and ADA claims are subject to the same analysis and thus may be addressed at the same time. *See* Weidow v. Scranton Sch. Dist., 460 Fed.Appx. 181, 184 (3d Cir. 2012) ("Because Congress has directed [that the ADA] be interpreted in a manner consistent with [the Rehabilitation Act], we will consider [Plaintiff's] claims under those statutes together.") (citation and internal quotation marks omitted) (first two alterations in original); Chambers ex rel. Chambers v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009) (noting that because the same standards govern both Rehabilitation Act and ADA claims, the court "may address both claims in the same breath"); Ridley School Dist. v. M.R., 680 F.3d 260, 282-83 (3d Cir. 2012) ("[T]he substantive standards for determining liability under the Rehabilitation Act and the ADA are the same..."). Claims under §504 of the RA and the ADA are interpreted consistently but §504 has an additional federal financial assistance component. Langston v. Milton S. Hershey Med. Center, 2016 WL 1404190, *6 (M.D.Pa. April 11, 2016) (citation omitted).

Section 504 of the RA, 29 U.S.C. §794(a), states, in relevant part:

No otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

Title II of the ADA provides:

15

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. §12132.

In this case, the plaintiff seeks compensatory damages on her §504 and ADA claims. To obtain compensatory monetary damages under §504 of the RA and the ADA, however, the Third Circuit requires a plaintiff to prove intentional discrimination. S.H. ex rel. Durrell v. Lower Merion Sch. Dist., 729 F.3d 248, 261 (3d Cir. 2013). The Third Circuit has also held that "a showing of deliberate indifference may satisfy a claim for compensatory damages under §504 of the RA [and the ADA]." S.H., 729 F.3d at 263; D.E.v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 269 (3d Cir. 2014). The Third Circuit Court in D.E., 765 F.3d at 269, stated:

> To satisfy the deliberate indifference standard, a plaintiff "must present evidence that shows both: (1) knowledge that a federally protected right is substantially likely to be violated ..., and (2) failure to act despite that knowledge." Id. at 265 (citing Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1139 (9th Cir. 2001). "Deliberate indifference does not require a showing of personal ill will or animosity toward the disabled person." Id. at 263 (quoting Meagley v. City of Little Rock, 639 F.3d 384, 389 (8th Cir. 2011) (internal quotation marks omitted)). It does, however, require a "deliberate choice, rather than negligence or bureaucratic inaction.'" Id. (quoting Loeffler v. Staten Island Univ. Hosp., 582 F.3d 268, 276 (2d Cir. 2009)).

The court will now address plaintiff's RA claims with her ADA claims.

### 1. Disparate Treatment Claims

Under the ADA, discrimination is prohibited "against a qualified

individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §12112.

The court in Reyer v. Saint Francis Country House, 243 F.Supp.3d 573, 591 (E.D.Pa. 2017), stated:

> To establish a prima facie case of disability discrimination under the ADA, a plaintiff must demonstrate: (1) that she is a disabled person within the meaning of the ADA; (2) that she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that she has suffered an otherwise adverse employment decision as a result of discrimination.

(citing Gaul v. Lucent Techs., 134 F.3d 576, 580 (3d Cir. 1998)).

"When a plaintiff attempts to prove a discrimination claim under a pretext theory, the *McDonnell Douglas* burden-shifting framework applies." Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citation omitted). As the court in Decker v. Alliant Technologies, LLC, 871 F.Supp.2d 413, 425 (E.D.Pa. 2012), then explained:

> If the plaintiff establishes a prima facie case of discrimination, then an inference of discriminatory motive arises and the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *See* Salley v. Circuit City Stores, Inc., 160 F.3d 977, 981 (3d Cir. 1998). If the employer does so, then the burden shifts back to the plaintiff to show that the employer's proffered reason is merely pretext for intentional discrimination. Makky, 541 F.3d at 214. The "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *See* Williams v. Phila. Housing Auth. Police Dep't, 380 F.3d 751, 759 n. 3 (3d Cir. 2004) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252–53, 101 S.Ct.

1089, 67 L.Ed.2d 207 (1981)).

"The burden to establish a prima facie case is a not an onerous one, but a prima facie case can allow a court 'to eliminate the most obvious, lawful reasons for the defendant's action.'" Id. (citing Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir. 1999).

In her Declaration, plaintiff states that she has the following disabilities: congestive heart failure; atrial fibrillation; degenerative disc disease; COPD; post-traumatic stress disorder; psoriatic arthritis, and rheumatiod arthritis. She also avers that she had these disabilities during her entire employment with the County and that the County was aware of her disabilities, including her 2010 heart attack, her May 2014 hospitalization for pneumonia related to her COPD and heart disease, her June 26, 2014 hospitalization for her heart disease, as well as the strokes she suffered during her employment with the County.

It appears that the County is not contesting that the plaintiff had disabilities under the meaning of the ADA, that it was aware of plaintiff's disabilities at all relevant times and, that it took adverse employment actions against plaintiff, i.e., it disciplined her and then terminated her. Nor does the County contest plaintiff's allegation that she was a "qualified individual with a disability." However, the County contends that the plaintiff has to show more than simply it knew of her disabilities and, it contends she has failed to establish that her disabilities were a determinative factor in its decision to terminate her.

18

Based on the facts discussed above, the court finds that plaintiff has established a prima facie case of discrimination under the ADA. Thus, the burden shifts to the County to articulate a legitimate, nondiscriminatory reason for the plaintiff's termination.

The County argues that it had a legitimate, nondiscriminatory reason to terminate plaintiff. It states that after it spoke to plaintiff's co-workers and it received the June 20, 2014 complaint letter about plaintiff and, after meeting with plaintiff's co-workers and interviewing plaintiff, "the County determined that Ms. Chamberlain's continued harassment of her co-workers justified her termination." The County states that plaintiff relies on two instances to support her claim under ADA, namely, when Deutsch asked about her use of Humira and when a secretary from the Commissioners' office (Lori Gados) stated that her use of health insurance was costing the County more money. Even if both instances are true, the County argues that since neither Deutsch nor the secretary had authority to fire plaintiff, their statements cannot be causally connected to the decision to terminate plaintiff. The County also argues that there is no temporal proximity between the County's knowledge of the plaintiff's disabilities and "the determination to fire her which could raise an inference of disability discrimination" since "plaintiff has testified that the [County] was aware of her disabilities from the time she first started working at the County over 14 years before she was terminated."

"A plaintiff can show pretext, and so defeat a motion for summary judgment, 'by either (i) discrediting the proffered reasons, either

circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.'" Decker, 871 F.Supp.2d at 429 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

In this case, plaintiff offered evidence to prove that the County's proffered reason for terminating her is merely a pretext for intentional discrimination with respect to her ADA and RA disparate treatment claims. Plaintiff has offered enough evidence from which a fact finder could reasonably conclude that the adverse employment decision taken against her by the County was a result of discrimination due to her disabilities, i.e., she offered sufficient evidence to show that her disabilities were a determinative factor in the County's decision to terminate her. Plaintiff contends that either Gaylord or Henry requested plaintiff's co-workers and supervisor to write the June 2014 complaint letter. However, Gaylord testified that he did not instruct anyone to write the June 2014 complaint letter, including Deutsch. Henry, the County's Rule 30(b)(6) designee, also testified in his deposition in this case that he did not know if anyone at the County requested that the letter be written by plaintiff's co-workers. Plaintiff points out that at her union arbitration in August 2015, Henry testified that he requested that plaintiff's co-workers to write the complaint letter. As discussed above, Henry stated that after the Commissioners met with plaintiff's co-workers on June 20, 2014, they requested the employees to submit a formal written complaint about the

20

plaintiff in addition to the material which the employees had already given to the Commissioners. Thus, the record is not clear if plaintiff's co-workers and supervisor were directed to write the June 2014 complaint letter.

There is however no dispute that complaint letter was written despite the fact that in her prior 14 years of working for the County, plaintiff had no disciplinary issues and had no write-ups for misconduct. The complaint letter was also written shortly after plaintiff was hospitalized and out of work from May 27 to May 30 due to her disabilities. Plaintiff also avers that Deutsch was aware that she was in the hospital during this time and why. Further, plaintiff produced evidence of several instances which she contends show that she was treated differently in her office due to her disabilities, including her testimony that she suffered from constant harassment by her co-workers and Deutsch regarding her disabilities, including her heart condition and her use of the bathroom. Thus, plaintiff has presented evidence that would allow the jury to infer that the County's proffered non-discriminatory reason was a "post hoc fabrication." Fuentes, 32 F.3d at 764.

The jury will determine if the County's supervisory personnel directed plaintiff's co-workers to write the complaint letter and if they did so to create a pretext for the decision to terminate plaintiff. As such, the court finds that plaintiff has presented sufficient evidence to proceed to trial on her disparate treatment disability discrimination claims against the County under the RA and the ADA, Counts 1 and 6.

21

### *2. Failure to Accommodate Claim*s

In Counts 2 and 7, plaintiff alleges failure to accommodate in violation of the RA and the ADA. Plaintiff alleges that she repeatedly informed the County of her need for accommodations due to her disabilities, and that the County failed to giver her accommodations and refused to engage in the interactive process. She also alleges that the County harassed her and allowed its employees to harass her due to her requests for reasonable accommodations.

The court in Decker, 871 F.Supp.2d at 430-31, detailed the elements of a failure to accommodate claim under the ADA, and stated:

> "Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." Taylor, 184 F.3d at 306. For an employer "to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination ... [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'" Hohider, 574 F.3d at 186–87 (quoting Williams, 380 F.3d at 761) (internal quotations omitted).

Additionally, "a plaintiff can assert a failure to accommodate as an independent basis for liability under the ADA and RA." Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa., 483 Fed.Appx. 759, 763 (3d Cir. 2012); Alboniga, 87 F.Supp.3d at 1337. "To make out such a claim, a plaintiff must show that the accommodation he seeks is reasonable, ..., i.e., that it is

22

"necessary to avoid discrimination on the basis of disability." Muhammad, 483 Fed.Appx. at 763 (internal citation omitted) (quoting 28 C.F.R. §35.130(b)(7)).

The plaintiff also states that "her requests for time off including her hospitalizations, while protected by FMLA, were also requests for accommodation under the ADA and Rehabilitation Act." She cites to McDonald v. SEIU Healthcare, 2014 WL 4672493, *9 (M.D.Pa. Sept. 18, 2014) ("A medical leave of absence may constitute a reasonable accommodation under the ADA." (citing 29 C.F.R. §1630 app. (noting that reasonable accommodations could include 'providing additional unpaid leave for necessary treatment'")).

The County argues that plaintiff did not provide evidence that she was denied an accommodation and that she ever requested an accommodation during her employment. However, plaintiff testified that she made three specific requests for accommodations verbally and in writing, one that she could not lift over 15 pounds, one that she had to take breaks from typing due to her arthritis, and one that she requested portable toilets when the County was having construction performed in the bathrooms due to her diuretic medication for her congestive heart failure.

The court finds that the plaintiff has failed to provide sufficient evidence that her termination was connected to her requests for accommodations. There is no evidence that plaintiff was terminated for requesting sick leave. Further, Deutsch gave plaintiff an accommodation for lifting even though plaintiff stated that he would tell her to lift objects at times when they were

received by the office. There is no evidence that the plaintiff was refused an accommodation for taking breaks while typing. Nor is there any evidence that the refusal to provide temporary portable toilets for plaintiff during the 2011 construction had any connection to her termination in July 2014.

Thus, the court will grant the County's motion as to plaintiff's failure to accommodate claims, Counts 2 and 7.

### 3. Retaliation Claims

In Counts 3 and 8, plaintiff alleges retaliation in violation of the RA and the ADA. Plaintiff alleges that the County retaliated against her for requesting accommodations for her disabilities by subjecting her to materially adverse actions, including disciplinary actions, harassment and termination. Under the ADA, employers are prohibited from retaliating against their employees for requesting accommodations for disabilities. Sulima v. Tobyhanna Army Depot, 602 F.3d 177, 188 (3d Cir. 2010). "To establish a prima facie case of unlawful retaliation in violation of the ADA, a plaintiff must show that he engaged in protected activity, that he suffered adverse action either after or contemporaneous with the protected activity, and that there was a causal connection between the employee's protected activity and the employer's adverse action." Canevari v. Itoh Denki U.S.A., Inc., (M.D.Pa. July 24, 2017) 2017 WL 4080548, *13 (citations omitted), adopted by 2017 WL 4077394 (M.D.Pa. Sep. 14, 2017). "An employee engages in protected activity when he requests a reasonable accommodation for his disability under [ ] the ADA

24

[ ]." Id. (citation omitted). Further, "[w]hat matters under the ADA are not formalisms about the manner of the request, but whether the employee ... provides the employer with enough information that, under the circumstances, the employer can fairly be said to know of both the disability and desire for accommodation." Drozdowski v. Northland Lincoln Mercury, 321 Fed.Appx. 181, 185 (3d Cir. 2009).

The County argues that even if the court finds evidence that plaintiff requested accommodations, plaintiff cannot show that there was a causal link between her requests and her termination since "she was fired almost between 3 to 11 years after the requests."

As discussed above, the court finds that plaintiff has not produced sufficient evidence to show that there was a causal connection between her requests for accommodations and the adverse actions. Plaintiff did not request accommodations directly from the Commissioners and there is no evidence that the County retaliated against her due to her requests by terminating her. Nor is there any temporal proximity between plaintiff's requests for accommodation regarding lifting, breaks for typing and portable toilets, and her termination.

Thus, the court will grant the County's motion as to plaintiff's retaliation claims, Counts 3 and 8.

## C.    ADEA Claim, Count 9

Plaintiff alleges that the County terminated her based on her age in

violation of the ADEA. She alleges that she was over 40 years old and that the County and its employees harassed her due to her age. She avers that her supervisor and co-workers called her "old lady" due to her age and her inability to perform some physical tasks at work. Plaintiff also avers that McClain was substantially younger than her and replaced her, namely, plaintiff states that she was 47 and McClain was 24.

The County argues that it is entitled to summary judgment in this disparate treatment case because the plaintiff has not offered sufficient evidence to prove that its actions in terminating her were taken because of her age and since there is no evidence that she was replaced by a substantially younger person.

Under the ADEA, employers are prohibited from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. §623(a)(1). "To succeed on an ADEA claim, a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action." Howell v. Millersville University of Pennsylvania, 283 F.Supp.3d 309, 322 (E.D.Pa. 2017) (citing Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177–78, 129 S.Ct. 2343 (2009)). It is not enough for the plaintiff to show that her age was a factor that motivated the employer's action, rather she must point to evidence that could support an inference that her age had a "determinative influence" on the decision. Goss 557 U.S. 176. This burden remains squarely with the

plaintiff, who may prove her claims through direct or circumstantial evidence. Id. at 177. Thus, following *Goss*, to prove a disparate-treatment discrimination claim under the ADEA, "the evidence must be a sufficient basis for a reasonable jury to conclude that age was the determinative, but-for cause of the employee's termination." Palmer v. Britton Industries, Inc., 662 Fed.App'x 147, 151 (3d Cir. 2016).

Here, there is no direct evidence of discrimination by the County. There is no evidence that the employees of the County who allegedly harassed plaintiff due to her age were the persons who were involved with the decision to terminate plaintiff. There is no evidence presented by plaintiff that the decisionmakers, i.e., the County Commissioners, had a bias against her due to her age or that they took any action against her based on her age. As such, plaintiff is proceeding on her ADEA claim based on circumstantial evidence.

"To establish a prima facie case of age discrimination, a plaintiff must demonstrate that (1) [she] is forty years of age or older; (2) the defendant took an adverse employment action against [her]; (3) [she] was qualified for the position in question; and (4) [she] was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). "The requirement that a plaintiff establish a prima facie case of discrimination 'is not intended to be onerous.'"Andersen v. Mack Trucks, Inc., 118 F.Supp.3d 723, 738 (E.D.Pa. 2015) (citation omitted).

"Age discrimination claims in which the plaintiff relies on circumstantial

evidence proceed according to the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Howell, 283 F.Supp.3d at 322-23 (citing Keller v. Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)). Since the court has detailed the three-part burden-shifting framework above, it will not be repeated. *See also id.* at 323; Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009).

The County states that plaintiff fails to establish her prima facie case of age discrimination because she has presented no evidence that her replacement was sufficiently younger and since there is no evidence that plaintiff was replaced at all. Plaintiff avers in her Declaration that she was replaced by McClain who was substantially younger than her. The County attached the unsigned and undated Affidavit of Deutsch to its reply brief, (Doc. 38, Ex. C), in which he states that after plaintiff was terminated her position was not filled and that McClain did not replace plaintiff. He also states that as of the date of the Affidavit, which was filed April 4, 2018, plaintiff's position remained unfilled.

Even though Deutsch's Affidavit is not signed or dated, it can still be considered for purposes of the County's summary judgment motion. Under Rule 56(c)(2), "evidence may be considered in a *form* which is inadmissible at trial, [if] the *content* of the evidence [is] capable of admission at trial." Bender v. Norfolk Southern Corp., 994 F.Supp.2d 593, 599 (M.D.Pa. 2014). Thus, if the evidence satisfies "the applicable admissibility requirements at trial", "the evidence may be used on summary judgment." Id. (citation

28

omitted). The court finds that the content of the averments in Deutsch's Affidavit are capable of admission at trial since the evidence in the record shows that Deutsch would have personal knowledge of whether plaintiff's position was filled after her termination. As such, Deutsch's Affidavit can be used to support the County's motion.

Next, the County argues that even if plaintiff could prove that she was replaced with someone sufficiently younger, it had a legitimate, nondiscriminatory reason for firing her, namely, the complaint letter of her co-workers and her supervisor claiming that over several years plaintiff "intimidated and harassed" them. Further, the County contends that plaintiff provided no evidence that her age was a factor in her firing, and that while she avers that co-workers and her supervisors would call her "old lady", there is no evidence that the County Commissioners, who had the authority to terminate plaintiff, called her "old lady" or were aware that her co-workers called her this. The County also states that plaintiff admitted that she never brought this issue to the attention of the Commissioners.

There is no credible evidence to show that McClain actually replaced plaintiff after her termination. Further, Deutsch's Affidavit shows that plaintiff's position was not filled by the County after plaintiff's termination. Additionally, the court finds that there is simply no evidence that the Commissioners harassed plaintiff due to her age or were aware that plaintiff was harassed due to her age. Nor does the court find any evidence that the Commissioner's decision to terminate plaintiff was motivated by discriminatory animus based

on plaintiff's age.

Thus, the court will grant the County's motion with respect to plaintiff's ADEA claim, Count 9.

### D.  **FMLA Claims, Counts 4 and 5**

In Count 4, plaintiff raises an interference claim under the FMLA and in Count 5, she raises a retaliation claim under the FMLA. Plaintiff claims that the exercising of her right to use FMLA leave was a motivating factor in the County's decision to terminate her and that the County retaliated against her for taking FMLA leave by terminating her. The County moves for summary judgment with respect to plaintiff's claims of interference and retaliation under the FMLA.

#### *1. FMLA Interference Claim, Count 4*

The purpose of the FMLA is, in part, to allow employees to "balance the demands of the workplace with the needs of families" and "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. §2601(b)(1)–(2). It provides that an eligible employee "shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. §2612(a)(1)(D). Once an employee returns from FMLA leave, the employee is entitled to return to the same position they had prior to leaving, or to an equivalent position. 29

U.S.C. §2614(a)(1). However, this right to be reinstated does not entitle the restored employee to a right, benefit, or position to which the employee would not "have been entitled had the employee not taken the leave." *Id.* §2614(a)(3)(B).

Before taking leave, an employee must give their employer notice "stat[ing] a qualifying reason for the needed leave." 29 C.F.R. §825.301(b); *see also Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 153 (3d Cir. 2015). The employer may also require its employees to support their requests for leave with a certification issued by a health care provider. 29 U.S.C. §2613(a).

An employee does not need to specifically and expressly request leave under the FMLA to qualify for protection. 29 C.F.R. §825.301(b). The employee does, however, need to provide some notice to make the employer aware that the employee needs FMLA-qualifying leave and how long that leave will be. *Id.* §825.302(c). But, the burden is on the employer to ensure that the employee is made aware of their rights under the FMLA and that the qualifying leave is designated as such. *Id.* §825.300.

Once an employee requests leave, the employer is responsible for designating it as FMLA-qualifying or not and the employer must advise the employee if it is. *Id.* §825.300(b)(1), (d). Additionally, the employer must, within a reasonable time, provide the employee with "written notice detailing the specific expectations and obligations of the employee and explaining any consequences of a failure to meet these obligations," including whether the

leave will be counted as FMLA leave and the employee's right to restoration. *Id.* §825.300(c)(1). In "circumstance[s] where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether [the requested] leave is potentially FMLA-qualifying." *Id.* §825.301(a).

In Lichtenstein v. University of Pittsburgh Medical Center, 691 F.3d 294, 301 (3d Cir. 2012), the Third Circuit stated:

> [w]hen employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. Nor may employers "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful." The former provision is generally, if imperfectly, referred to as "interference" whereas the latter is often referred to as "retaliation."

(internal citations omitted). *See also* 29 U.S.C. §2615(a)(1).

The Third Circuit has also held that "an individual supervisor working for an employer may be liable as an employer under the FMLA." Haybarger v. Lawrence Cnty. Adult Prob. & Parole, 667 F.3d 408, 415 (3d Cir. 2012).

An interference claim, such as the one plaintiff raises in Count 4, protects a "series of prescriptive substantive rights for eligible employees, often referred to as [] [entitlement[s] . . . which set floors for employer conduct." *Callison v. City of Philadelphia*, 430 F.3d 117, 119 (3d. Cir. 2005). Unlike a retaliation claim, an employee alleging interference need not show discriminatory intent on the part of the employer and "the employer cannot justify its actions by establishing a legitimate business purpose for its decision." *Id.* at 119–120. An employee can bring both interference and

32

retaliation claims under the FMLA against an employer. Thus, "firing an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009).

In order to establish a valid claim of interference, the employee only needs to show that she was entitled to benefits under the FMLA and that she was denied them. *Callison*, 430 F.3d at 119. Ultimately, the employee must establish that: (1) the employee was eligible under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017).

United States Department of Labor ("USDOL") regulations implementing the FMLA expressly provide that any violations of the law itself or its regulations "constitute interfering with, restraining, or denying the exercise of rights." 29 C.F.R. §825.220(b); *see also Conoshenti v. Pub. Serv. Elec. & Gas. Co.*, 364 F.3d 135, 142 (3d Cir. 2004). This would include "not only refusing to authorize FMLA, but discouraging an employee from using such leave[,]" in addition to "manipulation" by the employer in an attempt to avoid FMLA responsibilities. *Id.*; *see also id*. Interfering with an employee's rights also includes an employer's failure to *advise* the employee of their rights under the FMLA*. Conoshenti*, 364 F.3d at 142–143. In order to prevail on an

interference claim based on a failure to advise, however, the employee must show prejudice by "establishing that this failure to advise rendered [the employee] unable to exercise that right in a meaningful way, thereby causing injury." *Id.* at 143 (relying on *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81 (2002)). Here, the plaintiff's interference claim is premised on the County's alleged failure to provide her with notice of its designation as to whether her leave for her May and June 2014 hospitalizations was FMLA qualifying and on the County's alleged failure to notify her of her FMLA rights, protections and responsibilities.

Specifically, plaintiff avers in her Declaration that she was hospitalized during the end of May 2014 for pneumonia due to her COPD and heart disease and, that she was out of work from May 27 through May 30. She also avers that the County and Deutsch were aware of her hospitalization. Additionally, plaintiff avers that on June 26, 2014 she was again admitted to the hospital for her heart disease and that she was out of work for two days. She further avers that the County and Deutsch were aware of this second hospitalization.

The evidence, i.e., plaintiff's County time sheet, indicates that plaintiff took 7 hours leave on both Thursday June 26 and Friday June 27, 2014, but it does not indicate why plaintiff took the leave. (Doc. 38, Ex. A). However, as the County indicates in its reply brief, the County's Stop Loss Claim Form issued on plaintiff's termination, shows that plaintiff took "sick leave" from May 27 through May 30, 2014, but the Form does not indicate that plaintiff took

any medical leave on June 26 and 27, 2014. (Doc. 38, Ex. B). Thus, although plaintiff avers in her Declaration and testified in her deposition that she was in the hospital on June 26 and 27, 2014, and her time sheet indicates that she took 7 hours leave both days, the record does not indicate that the plaintiff requested FMLA leave for this time. Further, there is no dispute that plaintiff took sick leave from May 27 through May 30, 2014, and that she was hospitalized during this time due to her disabilities. In her Declaration, plaintiff avers that the County did not offer her FMLA paperwork or explain her eligibility for FMLA leave regarding her medical absences in May and June 2014. The County contends that plaintiff was offered FMLA leave for her May 2014 hospitalization but that it was not sure if she applied for FMLA leave.

The court finds that the County is entitled to summary judgment with respect to both of plaintiff's FMLA claims regarding her June 26 and 27, 2014 hospitalization. Long before plaintiff's leave for June 26 and 27, 2014, the record shows that plaintiff always requested FMLA leave in writing. Plaintiff also admitted that she did not apply for FMLA leave in June 2014. Further, the County Commissioners were not aware that plaintiff was hospitalized in June 2014. Thus, plaintiff has failed to meet the fourth element of an interference claim since there is no evidence that she gave the County notice of her intention to take FMLA leave for June 26 and 27, 2014. In short, the plaintiff has failed to produce sufficient evidence that she requested and was denied FMLA leave regarding her June 26 and 27, 2014 hospitalization. The County cannot be held liable for interfering with plaintiff's June 26-27 leave under the

35

FMLA if it plaintiff did not request such leave. Nor can the County be held liable for retaliating against plaintiff due to her June 26 and 27, 2014 leave since she did not produce evidence that she invoked her right to FMLA-qualifying leave. *See* Lichtenstein, 691 F.3d at 301-02. It is well-settled that the nonmoving party "may not rest on the allegations set forth in its pleadings but must counter with evidence that demonstrates a genuine issue of fact." Big Apple BMW, 974 F.2d at 1363. Also, if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 mandates the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 322-23; Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 777 (3d Cir. 2007).

Thus, the court will grant the County's motion with respect to plaintiff's FMLA claims in Counts 4 and 5 alleging interference and retaliation with respect to her medical leave for her June 26 and 27, 2014 hospitalization.

The court also finds that plaintiff has failed to present sufficient evidence to proceed with her FMLA claim in Count 4 alleging interference with her medical leave for her May 27 through May 30, 2014 hospitalization. Plaintiff claims that the County did not provide her with any information regarding her rights under the FMLA for her stated leave. She also presented evidence that the County would only provide her with paperwork regarding the FMLA, and that it would only designate leave as being under the FMLA, if she was out of

vacation and sick time, because that was the County's practice.

As mentioned, interfering with an employee's rights also includes an employer's failure to advise the employee of their rights under the FMLA, but the employee must show prejudice by "establishing that this failure to advise rendered [the employee] unable to exercise that right in a meaningful way, thereby causing injury." Conoshenti, 364 F.3d at 142-43. Here, plaintiff has not produced enough evidence to show that she was denied FMLA benefits regarding her May 27 through May 30, 2014 leave. As stated, plaintiff admitted that she had always previously requested FMLA leave in writing and, that she was aware of the process based on her prior requests over the years. Further, and there is no indication in the record that plaintiff submitted a written request for FMLA leave regarding her May 27 through May 30, 2014 hospitalization. *See* Sommer v. The Vanguard Grp., 461 F.3d 397, 399 (3d Cir. 2006) (Third Circuit held that an interference claim under the FMLA requires an employee to show both that he was entitled to FMLA benefits and that he was denied those benefits). The record shows that plaintiff's leave for this time period was designated as "sick leave" as opposed to FMLA leave. (Doc. 38, Ex. C). Thus, there is not sufficient evidence that plaintiff was denied FMLA benefits by the County for her May 2014 leave.

As such, the court will grant the County's motion with respect to plaintiff's FMLA claim in Count 4 alleging interference with respect to her medical leave for May 27 through May 30, 2014.

## 2. FMLA Retaliation Claim, Count 5

Remaining is plaintiff's FMLA claim in Count 5 alleging retaliation only with respect to her medical leave for May 27 through May 30, 2014.

"To succeed on an FMLA retaliation claim, a plaintiff must show that '(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights.'" Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014) (citing Lichtenstein, 691 F.3d at 302).

Plaintiff states that she was suspended without pay about one month after her May 27 through May 30, 2014 hospitalization leave. In support of the causal connection element of her FMLA retaliation claim, plaintiff testified that in March 2014, Gados, a secretary in the Commissioners' office, asked her how much leave time she had used the prior year for being sick. Plaintiff asked Gados why she wanted to know and Gados responded that the County had to know for plaintiff's health insurance "because [her] health insurance is costing [the County] more money because of how much of it [she] use[s]." Plaintiff also states that the temporal proximity between the use of her FMLA protected leave for her hospitalization related to her disabilities and the County's termination of her employment establishes the second and third elements of her retaliation claim, i.e., she suffered adverse employment actions and the adverse actions were causally connected to the invocation of her right to FMLA leave.

Plaintiff's retaliation claim is based on circumstantial evidence.

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law" and, "claims based on circumstantial evidence have been assessed under the burden-shifting framework established in *McDonnell Douglas* [ ]." Lichtenstein, 691 F.3d at 302. Thus, plaintiff must first establish a prima facie case of discrimination. Ross, 755 F.3d at 193.

The court finds that the plaintiff has failed to establish a prima facie case regarding her FMLA retaliation claim. First, the record shows that plaintiff was not suspended without pay about one month after her May 2014 hospitalization leave, rather she was on paid administrative leave. Second, the record does not indicate that plaintiff made a written request for FMLA leave with respect to her May 27 through May 30, 2014 hospitalization. Based on plaintiff's previous requests for FMLA leave, she was well aware of the process required by the County to apply for such leave. Third, the County's Stop Loss Claim Form indicated that plaintiff used her sick leave for her May 2014 hospitalization.

Thus, the court finds that plaintiff has failed to produce sufficient evidence to show that the adverse actions against her taken by the County were causally linked to her leave for May 27 through 30, 2014 or that the Commissioners, in making their decisions, were motivated by discriminatory or retaliatory intent.

As such, the court will grant the County's motion with respect to plaintiff's FMLA claim in Count 5 alleging retaliation with respect to her

medical leave for May 27 through May 30, 2014.

Thus, the court will grant the County's motion with respect to Count 4 and Count 5 in their entirety.

### 3. FMLA Wage Loss Claim

Finally, the County argues that even if plaintiff can proceed on her FMLA claims, she is not entitled to any damages on these claims since there is no evidence that she suffered any wage or monetary loss as a result of her termination. Since the court is granting the County's motion with respect to plaintiff's FMLA claims, this argument will not be addressed as it is now moot.

## IV. CONCLUSION

For the foregoing reasons, the County's motion for summary judgment, (Doc. 28), will be **GRANTED IN PART AND DENIED IN PART**. The County's motion will be **DENIED** with respect to plaintiff's disparate treatment disability discrimination claims under Section 504 of the Rehabilitation Act and under the ADA, Counts 1 and 6 of her amended complaint, (Doc. 15). The County's motion will be **GRANTED** with respect to plaintiff's failure to accommodate claims under the RA and the ADA, Counts 2 and 7. The County's motion will be **GRANTED** as to plaintiff's retaliation claims under the RA and the ADA, Counts 3 and 8. The County's motion will be **GRANTED** with respect to plaintiff's ADEA claim, Count 9. The County's motion will be **GRANTED** with respect to plaintiff's FMLA claims in Counts 4 and 5 alleging interference and

retaliation.

Finally, the County's motion with respect to the issue of damages under the FMLA will be **DENIED AS MOOT**. A separate order shall issue.

s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**Dated: November 13, 2018**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2016 MEMORANDA\16-1408-01.wpd